IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| SALZGITTER MANNESMANN INTERNATIONAL (USA) INC. | § § § § | |
| *Petitioner,* | § § | |
| v. | § § § | Civil Action No. 3:22-cv-30 |
| SUN STEEL COMPANY LLC d/b/a ESMARK STEEL GROUP MIDWEST, LLC, and ESMARK, INC. | § § § § § | |
| *Respondents.* | § | |

**SALZGITTER MANNESMANN INTERNATIONAL (USA) INC.'S PETITION AND MOTION TO CONFIRM ARBITRATION AWARD**

Petitioner Salzgitter Mannesmann International (USA) Inc. ("Salzgitter") respectfully requests this Court to confirm a final arbitration award entered in its favor against Respondents Sun Steel Company LLC d/b/a Esmark Steel Group Midwest, LLC ("Esmark Midwest") and Esmark, Inc. (together with Esmark Midwest, "Esmark")[1] pursuant to Section 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207, and Section 9 of the FAA, 9 U.S.C. § 9. An American Arbitration Association ("AAA") panel of three neutral arbitrators, Alvin Zimmerman, George Shipley, and Charles Kelly, has confirmed Esmark owes Salzgitter $12,689,133.60 plus post-judgment interest, arbitration fees and expenses, and attorneys' fees. Salzgitter brings this action to confirm the Award and seeks prompt payment of Esmark's debt.

---

[1] The January 26, 2021 Final Arbitration Award has been filed under seal as Exhibit A (herein after referenced as the "Award").

1

## I.   The Parties

1. Salzgitter is a Delaware corporation with its principal place of business in Houston, Texas.

2. Esmark Midwest is an Illinois limited liability company and may be served through its CEO, James Bouchard, by certified mail at its principle place of business, 2500 Euclid Avenue, Chicago Heights, IL 60511, pursuant to AAA Commercial Arbitration Rules R-1 and R-43 and the Master Indemnity and Hold-Harmless Agreement.

3. Esmark, Inc. is a Delaware corporation and may be served through its manager, James Bouchard, by certified mail at its principle place of business, 100 Hazel Lane, Suite 300, Sewickley, PA 15143, pursuant to AAA Commercial Arbitration Rules R-1 and R-43 and the Master Indemnity and Hold-Harmless Agreement.

## II.   Jurisdiction and Venue

4. This Court has subject matter jurisdiction over these proceedings pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("New York Convention"). Under the FAA, the New York Convention "shall be enforced in United States courts in accordance with this chapter." 9 U.S.C. § 201. An arbitration agreement "falls under the Convention" if it arises out of a commercial legal relationship and "that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202.

5. The arbitration agreement arose out of a commercial relationship between Salzgitter and Esmark which contemplated foreign performance. Esmark requested that

Salzgitter supply it steel from Essar Algoma, a Canadian steel mill.[2] To perform under the relevant steel purchase contracts with Esmark, Salzgitter was obligated to both place the steel orders with and submit payment to the Canadian mill and have the steel shipped from Canada to the United States. Because the parties' commercial relationship envisaged performance in Canada, the New York Convention applies and this Court has subject matter jurisdiction. *See, e.g.*, *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 340 (5th Cir. 2004) (New York Convention applied to contract between two U.S. citizens involving performance in West Africa); *Lander Co. v. MMP Invs., Inc.*, 107 F.3d 476, 479 (7th Cir. 1997) (New York Convention applied to a contract between two U.S. citizens involving performance in Poland); *Tricon Energy, Ltd. v. Vinmar Int'l, Ltd.*, No. 4:10-CV-05260, 2011 WL 4424802, at *6–7 (S.D. Tex. Sept. 21, 2011) (relying on *Freudensprung* and *Lander* to find New York Convention applied to contract between two U.S. citizens involving performance in Asia), *aff'd*, 718 F.3d 448 (5th Cir. 2013).

6.   This Court also has subject matter jurisdiction because the commercial relationship between Salzgitter and Esmark bears a reasonable relation with foreign states. A "reasonable relation" does not require that a foreign state have a "significant" or "clear" interest in the matter. *See Marino v. Royal Caribbean Cruises Ltd.*, No. 3:19-CV-00082, 2019 WL 7842573, at *6 (S.D. Tex. Dec. 23, 2019); *Galtney v. KPMG LLP.*, No. CIV.A. H05583, 2005 WL 1214613, at *3 (S.D. Tex. May 19, 2005) (a letter expressing merely an *intent* to borrow funds from a foreign bank was evidence of a reasonable relation to a

---

[2] *See, e.g.*, **Exhibit B**, Purchase Requisition Form (filed under seal) (showing that Salzgitter was required to supply steel from the Canadian steel mill for shipment on October 1, 2018).

foreign state). Rather, the agreement must simply "contemplate [international] action or involvement." *Soaring Wind Energy, L.L.C. v. Catic USA Inc.*, 946 F.3d 742, 753 (5th Cir. 2020). As discussed above, the commercial relationship between the parties expressly contemplated international involvement because Esmark demanded that its steel be sourced from Essar Algoma in Canada. This controversy's relations to Canada demonstrate contemplated foreign involvement sufficient to confer subject matter jurisdiction under the New York Convention.

7. Venue is proper in this Court pursuant to 9 U.S.C. § 204, which provides that an action may be brought "in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought." The parties expressly consented to bringing actions involving the underlying contracts and this arbitration in the United States District Court for the Southern District of Texas.[3] The United States District Court for the Southern District of Texas is also the judicial district in which a substantial part of the events or omissions giving rise to the underlying claims occurred. *See* 28 U.S.C. § 1391 (b)(2).

8. This Court has personal jurisdiction over Esmark because Esmark expressly consented to jurisdiction in this District.[4] Additionally, the arbitration is based in substantial part on business activities in Texas.

---

[3] **Exhibit C**, Terms and Conditions, ¶ 23 (filed under seal); **Exhibit D**, Guarantee Agreement, April 21, 2014, § 5.03 (filed under seal); **Exhibit E**, Master Indemnity and Hold-Harmless Agreement, July 19, 2011, § 3.10 (filed under seal).
[4] **Exhibit D** § 5.03; **Exhibit E** § 3.10; *see also* **Exhibit C** ¶ 23.

### III.     Factual Background

####    A. The Underlying Dispute

9.      Esmark regularly engaged Salzgitter to assist with purchases of steel, primarily in the form of steel coils, from steel mills in the United States and Canada. In these transactions, Salzgitter would purchase steel directly from the mill and then sell it to Esmark Midwest on extended 120-day payment terms. The contract between Salzgitter and Esmark Midwest for each transaction was made up of a purchase order from Esmark Midwest, an order confirmation from Salzgitter, a set of general terms and conditions, and a debit memo from Salzgitter (referred to collectively as the "Resale Contracts").[5] Esmark, Inc. guaranteed the payments due to Salzgitter under the Resale Contracts by any of Esmark, Inc.'s subsidiaries, including Esmark Midwest, through a Guarantee Agreement dated April 21, 2014.[6]

10.     The Salzgitter-Esmark business relationship was structured under a Master Indemnity and Hold-Harmless Agreement dated July 29, 2011 (the "Master Indemnity Agreement").[7] The Master Indemnity Agreement contained an arbitration clause: "[A]ny dispute, controversy or claim arising out of or relating to this Agreement or any Resale Contract . . . shall be settled by arbitration by three neutral arbitrators in accordance with the rules then obtaining of the American Arbitration Association."[8] Salzgitter and Esmark consented to the authority of the AAA to resolve the disputes presented in the arbitration.

---

[5] *See* **Exhibit B** (an example of a typical Resale Contract for an order for steel sourced from Essar Algoma in Canada); **Exhibit C** (an example of the terms and conditions attached to each Resale Contract).
[6] **Exhibit D**.
[7] **Exhibit E**.
[8] **Exhibit E** § 3.10.

5

11.     When Esmark wished to place an order with Salzgitter, Esmark Midwest would send a purchase order to Salzgitter setting forth the type, specification, and quantity of steel to be purchased and any shipping requirements. Salzgitter would then purchase the steel from the mill and sell it to Esmark on 120-day payment terms.

12.     Salzgitter performed its obligations under the Resale Contracts by purchasing the steel from the mills and having the steel shipped to Esmark. Salzgitter timely submitted invoices to Esmark, setting out the agreed upon prices and payment terms. Esmark began defaulting on its payment obligations to Salzgitter on December 4, 2018. Esmark continued to default on its payment obligations throughout December 2018. As a result of Esmark's defaults, Salzgitter stopped shipping and selling steel to Esmark.

13.     At the end of 2018, Esmark Midwest and Esmark Inc. (through its obligation in the Guarantee Agreement) owed Salzgitter at least $11,746,455. On January 30, 2019, Esmark, Inc. and Salzgitter entered into a payment plan (the "Payment Plan")[9] for the amount owed. Under the Payment Plan, Esmark, Inc. agreed to pay Salzgitter the outstanding amount owed on a quarterly schedule with interest at a rate of 4.5% per annum. Esmark, Inc. made the first quarterly payment totaling $545,555 in March 2019 but failed to make any of three remaining payments.

### B. The Arbitration Proceedings

14.     On July 17, 2020, pursuant to the arbitration clause in the Master Indemnity Agreement, Salzgitter filed a Demand for Arbitration with the AAA. Salzgitter requested

---

[9] **Exhibit F**, Payment Plan, Jan. 30, 2019 (filed under seal).

an award of actual damages for the separate breaches of the individual Resale Contracts and the Payment Plan and, in the alternative, damages for the value of steel delivered to Esmark Midwest under the theory of quantum meruit. Esmark responded that Esmark Midwest incurred damages in excess of the amount it and Esmark, Inc. owed to Salzgitter and sought a total offset based on an allegation that Salzgitter breached an implied promise to continue purchasing steel for Esmark.

15. Pursuant to the arbitration clause in the Master Indemnity Agreement, the arbitral panel consisted of a neutral Chairperson, Alvin Zimmerman, and one neutral arbitrator appointed by each party, Charles Kelly (by Esmark) and George Shipley (by Salzgitter) (together, the "Panel").

16. On December 4, 2020, a preliminary hearing was held before the Panel. Following the preliminary hearing, the Panel entered a Scheduling Order that permitted basic discovery. Specifically, the Panel allowed each party to submit twenty-five requests for production, twenty requests for admission, fifteen interrogatories, and take three depositions. The parties responded to multiple requests for production, requests for admission, and interrogatories, and participated in five depositions.

17. Pursuant to the Scheduling Order, the parties also submitted extensive pre-hearing briefing which included deposition testimony from witnesses and documentary evidence.

18. From November 15 through November 17, 2021, the Panel held a hearing on the merits in Houston, Texas. At the hearing, the parties' witnesses were subject to live cross-examination and each side submitted documentary evidence. The parties were

7

represented by counsel, who had the opportunity to examine witnesses, introduce documentary evidence, object to the admission of evidence, and present opening statements and closing arguments.

19. On December 20, 2021, the parties submitted extensive post-hearing briefing which included references to hearing testimony and answers to the questions submitted by the Panel. The parties also submitted proposed awards for consideration by the Panel.

20. On December 30, 2021, the Panel issued a procedural order closing the evidentiary stage of the proceedings.

### C. The Award

21. On January 26, 2022, after reviewing and considering the evidence presented, witness testimony, and the parties' arguments, the Panel issued its Award.[10]

22. In the Award, the Panel awarded Salzgitter damages in the amount of $12,689,133.60 and post-judgment interest compounded annually at a rate of 4.5% running until final payment is satisfied.

23. The Panel awarded Salzgitter reasonable attorneys' fees in the amount of $1,004,062.50.

24. The Panel awarded Salzgitter its arbitration fees and expenses in the amount of $87,195.08.

---

[10] **Exhibit A**.

## IV. Request for Confirmation of the Award

### A. Judicial Review of Arbitration Awards is Limited

25. It is well settled that judicial review of an arbitration award is "extraordinarily narrow." *Brook v. Peak Int'l, Ltd.*, 294 F.3d 668, 672 (5th Cir. 2002) (quoting *Gulf Coast Indus. Worker's Union v. Exxon Co.*, 70 F.3d 847, 850 (5th Cir. 1995)); *see also AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (describing the review of an arbitration award as "among the narrowest known to the law"); *McGee v. Armstrong*, 941 F.3d 859, 867 (6th Cir. 2019). The FAA imposes a heavy presumption in favor of confirming arbitration awards and federal courts should "defer to an arbitrator's decision when possible." *Antwine v. Prudential Bache Sec., Inc.*, 899 F.2d 410, 413 (5th Cir. 1990). This deference means that even if a court disagrees with the interpretation of a contract made by an arbitration panel, a court will uphold that decision so long as it is "rationally inferable from the letter or the purpose of the underlying agreement." *Timegate Studios, Inc. v. Southpeak Interactive, L.L.C.*, 713 F.3d 797, 802 (5th Cir. 2013).

### B. The Court Should Confirm the Award Under 9 U.S.C. § 207

26. The Award arises out of legal relationships that are commercial in nature, involve foreign performance, and provide for arbitration in the United States, a signatory of the U.S. Convention. Thus, the Award falls under Chapter 2 of the FAA for purposes of confirmation, recognition, and enforcement. 9. U.S.C. § 202; *see also Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 339–40 (5th Cir. 2004).

27. Under Chapter 2, "[a] district court should enforce an arbitration award as written—to do anything more or less would usurp the tribunal's power to finally resolve disputes and undermine the pro-enforcement policies of the New York Convention." *Wartsila Finland OY v. Duke Capital LLC*, 518 F.3d 287, 292 (5th Cir. 2008); *see also Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1166 (11th Cir. 2004) (noting that the "general rule" under the New York Convention is that "courts must confirm international arbitral awards"). "Indeed, [a] court may vacate the award only if the arbitrators exceeded their powers by acting contrary to express contractual provisions or if the award otherwise violates the NY Convention." *Soaring Wind Energy LLC*, 946 F.3d at 754 (internal quotation and modification marks omitted). The party opposing confirmation bears the "heavy burden." *See id.* ("[A] reviewing court examining whether arbitrators exceeded their powers must resolve all doubts in favor of arbitration.") (internal quotation marks omitted); *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1015–16 (5th Cir. 2015) ("The party opposing enforcement of the award on one of the grounds specified in the [New York] Convention has the burden of proof").

28. To that end, Salzgitter's only burden in obtaining confirmation under Section 207 is to provide the Court with two documents: (1) the Award and (2) the original agreements between the parties. *See Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 309 (S.D. Tex. 1997), *aff'd*, 161 F.3d 314 (5th Cir. 1998). The Award is being filed under seal as Exhibit A. The original agreements between the parties are being filed under seal as Exhibit C (the terms and conditions attached to each Resale

10

Contract), Exhibit D (the Guarantee Agreement), Exhibit E (the Master Indemnity Agreement), and Exhibit F (the Payment Plan). Therefore, Salzgitter has met its burden for confirmation of the award. *See id.*

29. This petition is timely because it is filed within three years after the issuance of the Award. *See* 9 U.S.C. § 207.

30. In light of the above, the Award should be confirmed pursuant to the New York Convention. *Id.*

### C. The Court Should Confirm the Award Under 9 U.S.C. § 9

31. Alternatively, Salzgitter moves to confirm the Award under 9 U.S.C. § 9. Like Chapter 2, Chapter 1 of the FAA mandates the confirmation of awards except on specific and limited grounds. "Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts." *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008). Thus, "'[j]udicial review of an arbitration award is extraordinarily narrow.'" *Brook*, 294 F.3d at 672; *see also McKool Smith, P.C. v. Curtis Int'l, Ltd.*, 650 F. App'x 208, 211 (5th Cir. 2016) (noting that as a result of this policy, "the review of the underlying award is exceedingly deferential"). The "FAA imposes a heavy presumption in favor of confirming arbitration awards; therefore, a court's confirmation of an arbitration award is usually routine or summary." *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 842 (11th Cir. 2011) (internal citation omitted"); *see also Woods v. P.A.M. Transp. Inc.-L.U.*, 440 F. App'x 265, 268 (5th Cir. 2011) (noting the "summary nature of proceedings to confirm arbitration awards" and "the strong national policy favoring expeditious enforcement of

arbitration awards"). Similar to Section 207, the burden is on the party opposing confirmation under Section 9 to show that one of the limited grounds set forth under Sections 10 or 11 of the FAA applies. *Id.*

32. As with Section 207, Salzgitter has met its burden under Section 9 of the FAA by presenting the Award and the agreements between the parties. Therefore, the Award should be confirmed under the FAA.

## V. Prayer for Relief

Salzgitter prays that the Court:

33. Issue an order confirming the Award of the Panel as authorized by 9 U.S.C. § 207 and § 9;

34. Enter a judgment that confirms the Award, holding Esmark liable to Salzgitter in the amounts of (1) $12,689,133.60 including post-judgment interest compounded annually at a rate of 4.5% running until final payment is satisfied, (2) $1,004,062.50 in reasonable attorneys' fees, and (3) $87,195.08 in arbitration fees and expenses;

35. Award Salzgitter its costs in bringing this action pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure;

36. Retain jurisdiction over this action, and, pursuant to Rule 69 of the Federal Rules of Civil Procedure, permit any discovery that may be proper to aid in the enforcement of this judgment; and

37. Award Salzgitter any and all other relief the Court deems just and proper.

Dated: January 27, 2022

Respectfully submitted,

**VINSON & ELKINS LLP**

*/s/ Patrick W. Mizell*
Patrick W. Mizell
State Bar No. 14233980
Federal I.D. 36390
Stephanie L. Noble
State Bar No. 24088068
Federal I.D. 2149555
Austin L. Turman
State Bar No. 24125714
Federal I.D. 3723394
1001 Fannin Street, Suite 2500
Houston, Texas 77002
T. (713) 758-2932
F. (713) 615-9935
pmizell@velaw.com
snoble@velaw.com
aturman@velaw.com

Brooke A. Noble
State Bar No. 24110166
Federal I.D. 3421406
200 West 6th Street, Suite 2500
Austin, Texas 78701
T. (512) 542-8409
F. (512) 236-3234
bnoble@velaw.com

**ATTORNEYS FOR PETITIONER SALZGITTER MANNESMANN INTERNATIONAL (USA) INC.**