United States District Court
Southern District of Texas
**ENTERED**
June 24, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| SALZGITTER MANNESMANN INTERNATIONAL (USA) INC., § § § § Petitioner. § § VS. § § SUN STEEL COMPANY LLC d/b/a § ESMARK STEEL GROUP MIDWEST, § LLC, and ESMARK, INC., § § Respondents. | CIVIL ACTION No. 3:22-cv-00030 |

## OPINION AND ORDER

Petitioner Salzgitter Mannesmann International (USA) Inc. ("Salzgitter") and Respondents Esmark, Inc. ("Esmark") and Sun Steel Company LLC d/b/a Esmark Steel Group Midwest, LLC ("Midwest") (collectively "Respondents") participated in an arbitration proceeding in Houston, Texas in November 2021. The three-member arbitration panel ruled in Salzgitter's favor in January 2022, awarding $12,689,133.60 plus post-judgment interest, arbitration fees and expenses, and attorney's fees. Salzgitter now seeks to confirm the arbitral award, relying solely on the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, commonly known as the New York Convention (the "Convention"), to confer subject-matter jurisdiction.

Respondents have filed a Motion to Dismiss (Dkt. 24), arguing that I lack jurisdiction over this dispute because that arbitral award does not fall within the Convention's purview. After carefully reviewing the Motion to Dismiss briefing, the applicable law, and hearing oral argument, I conclude that the Convention provides jurisdiction. Accordingly, the Motion to Dismiss is **DENIED**.

### I.  THE CONVENTION

The Convention is a multilateral treaty requiring contracting states to give effect to private agreements to arbitrate and recognize and enforce arbitration awards made in other contracting states. It was drafted by the United Nations Conference on International Commercial Arbitration in June 1958 and went into effect the following June. The Convention itself is a fairly unassuming document—it is about five pages long and

includes only 16 articles—yet the treaty is largely responsible for the prevalence of international arbitration as a dispute mechanism across the globe today.

The Convention contemplates two basic actions: (1) the recognition and enforcement of foreign arbitral awards; and (2) the referral of disputes by a court to arbitration. At a big-picture level, the Convention provides a "system through which to obtain domestic enforcement of international commercial arbitration [agreements or] awards resolving contract and other transactional disputes, subject only to minimal standards of domestic judicial review for basic fairness and consistency with national public policy." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998) (quotation omitted). *See also Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 746 (5th Cir. 2008) ("Though its essential purpose relates to the recognition and enforcement of foreign arbitral awards, the underlying theme of the New York Convention as a whole is clearly the autonomy of international arbitration." (quotation omitted)).

The United States recognized the treaty in 1970 through the enactment of Chapter 2 of the Federal Arbitration Act ("FAA").[1] *See* 9 U.S.C. § 201 (historical and statutory notes). As the Supreme Court observed decades ago:

> The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.

*Scherk v. Alberto—Culver Co.*, 417 U.S. 506, 520 n. 15 (1974) (quotation omitted).

As courts of limited jurisdiction, federal courts possess only the power authorized by the Constitution or statute. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The FAA grants federal courts original jurisdiction over actions that "fall[] under" the Convention. *See* 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.

---

[1] To date, 169 other countries have acceded to the Convention, the most recent of which being Turkmenistan in May 2022, followed closely by Iraq in May 2021. *See* NEW YORK CONVENTION GUIDE, https://newyorkconvention1958.org/index.php?lvl=cmspage&pageid=8&opac_view=-1&menu=715 (last visited June 21, 2022).

The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding.").

An action to enforce an arbitration agreement or arbitral award falls under the Convention in two instances. The most common scenario is where an agreement or award "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial" and is not entirely between United States citizens. *Id.* § 202. However, when an arbitral award arises out of a "relationship which is entirely between citizens of the United States," it shall be deemed to fall under the Convention only if the "relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." *Id.*

In the instant case, it is undisputed that the arbitral award arises out of a commercial relationship between citizens of the United States.[2] The jurisdictional question thus focuses on whether the parties' legal relationship "involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." *Id.*

With the legal backdrop now defined, I turn to the particular facts of this case.

## II.  BACKGROUND

Salzgitter and Respondents had a long-standing business relationship where, for nearly a decade,[3] Salzgitter served as a purchasing agent of sorts. The parties' arrangement was as follows: Midwest would place an order to purchase steel with Salzgitter using a "Purchase Order Requisition" form—which identified the steel mill and type of steel needed—and then, later, provide pricing terms. *See, e.g.*, Dkt. 3-2 at 2. When Salzgitter received the pricing terms, it sent Midwest an order confirmation with its own terms and conditions before purchasing the steel directly from the identified mill pursuant to the terms negotiated by Midwest. Salzgitter then arranged for the steel's delivery to Midwest or one of its agents located in the United States.

---

[2] Salzgitter is a Delaware corporation with its principal place of business in Houston, Texas. Esmark is a Delaware corporation with its principal place of business in Sewickley, Pennsylvania. Midwest is an Illinois limited liability company with its principal place of business in Chicago Heights, Illinois. Midwest's sole member is Esmark.

[3] Neither party specifies when the relationship began, but the record establishes that non-party Esmark Steel Group, LLC—a wholly-owned subsidiary of Esmark—and Salzgitter entered into a Master Indemnity and Hold-Harmless Agreement in July 2011. *See* Dkt. 3-5.

Salzgitter allowed Midwest to purchase the steel on a 120-day payment plan. In exchange for the favorable payment terms, Midwest paid Salzgitter a service fee plus interest. The parties collectively refer to the constellation of documents papering Salzgitter and Midwest's transactions (i.e., purchase orders, order confirmations, invoices, etc.) as "Resale Contracts." In 2014, Esmark—Midwest's parent company—guaranteed the payments due to Salzgitter under the Resale Contracts through a Guarantee Agreement. *See* Dkt. 3-4.

In 2018, Midwest placed several steel orders with Salzgitter pursuant to individual Resale Contracts. One of the contracts directed Salzgitter to purchase steel from Essar Steel Algoma, Inc. ("Algoma"), a Canadian company located in Ontario. It is this foreign transaction upon which Salzgitter primarily bases its claim of jurisdiction under the Convention.

In December 2018, Midwest fell behind in its payments, causing Salzgitter to stop transacting business on Midwest's behalf. At that time, Midwest—and Esmark via the Guarantee Agreement—owed Salzgitter over $11 million. The following January, in an effort to get the operation up and running again, Esmark entered into a payment plan (the "Payment Plan") with Salzgitter to repay the outstanding debt in four quarterly installments. *See* Dkt. 3–6. After making the first quarterly payment, Esmark defaulted on the Payment Plan.

Salzgitter sued Respondents for, *inter alia*, breach of the Resale Contracts and Payment Plan. In November 2021, Salzgitter's claims were heard at arbitration in Houston, Texas. The following January, an arbitration panel issued a final arbitration award in Salzgitter's favor. The panel awarded damages to Salzgitter under two separate contractual arrangements: (1) the Payment Plan between Esmark and Salzgitter; and (2) the series of Resale Contracts between Midwest and Salzgitter.[4]

---

[4] The panel found Respondents jointly and severally liable for the entire award. *See* Dkt. 3-1 at 29. *See also id.* at 10 ("There is nothing in the four corners of the Payment Plan that purports *per se* to release [] Midwest from its obligation. . . . Because there is no clear intent on behalf of Salzgitter to release [] Midwest from its obligations, those obligations are still owed by [] Midwest."); *id.* at 11 ("[T]he Panel finds the Guarantee Agreement signed by [Esmark] to be valid and enforceable. Therefore, [Midwest and Esmark] are jointly and severally liable for the amounts owed under the Resale Contracts.").

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Bloom v. Mem'l Hermann Hosp. Sys.*, 653 F. App'x 804, 805 (5th Cir. 2016) (quotation omitted). "Lack of subject-matter jurisdiction may be found in the complaint alone, the complaint supplemented by the undisputed facts as evidenced in the record, or the complaint supplemented by the undisputed facts plus the court's resolution of the disputed facts." *Gonzalez v. United States*, 851 F.3d 538, 543 (5th Cir. 2017) (quotation omitted).

The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction exists. *See id.* When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of the plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 223 (5th Cir. 2012) (quotation omitted). District courts also have wide discretion to allow affidavits or other documents and to hold a limited evidentiary hearing to resolve disputed jurisdictional facts. *See Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015). Thus, I may consider matters outside the pleadings to resolve factual challenges to subject-matter jurisdiction without converting the motion to dismiss to one for summary judgment. *See Battaglia v. United States*, 495 F. App'x 440, 441 (5th Cir. 2012).

Salzgitter has pleaded one ground for subject-matter jurisdiction: The Convention. As already noted, an "arbitral award arising out of a legal relationship" between citizens of the United States falls under the Convention only if that "relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202.

## IV. ANALYSIS

### A. THE PARTIES' ARGUMENTS

#### 1. *Salzgitter*

Salzgitter's principal argument focuses on Salzgitter's purchase of steel from Algoma, a Canadian company, per the terms of Salzgitter and Midwest's Resale Contract.[5] Salzgitter fervently maintains that the bar for establishing a reasonable relation with a foreign state is low, drawing support from the Fifth Circuit's recent decision in *Soaring Wind Energy, L.L.C. v. Catic USA Inc.*, 946 F.3d 742 (5th Cir. 2020). In that case, the Fifth Circuit opined: "It might be enough [to establish a reasonable relation with a foreign state] if an agreement call[s] for meetings to be held in a foreign country or if it should contain a list of mandatory foreign vendors." *Id.* at 753 (cleaned up). Respondents are quick to point out—and Salzgitter concedes—that this statement is dicta and not binding on my decision. Nonetheless, Salzgitter argues that *Soaring Wind* is indicative of the

---

[5] Salzgitter also argues that the parties' legal relationship bore a reasonable relation with Germany. This argument is based on an Esmark representative's testimony at arbitration that he twice traveled to Germany—the locale of Salzgitter's parent corporation, Salzgitter AG—to discuss whether Salzgitter AG would increase Esmark's credit limit. In support, Salzgitter cites a slew of cases for the proposition that "[e]vidence of foreign financing or a foreign loan—even if from an affiliate—is sufficient to establish jurisdiction under the New York Convention." *See* Dkt. 29 at 18. Cutting to the chase: I am not persuaded and find those cases readily distinguishable.

All but one of the cited cases concern a tax-shelter scheme wherein, among other things, the same global accounting firm was accused of selling or providing consulting services concerning Bond Linked Issue Premium Structure ("BLIPS") investment strategies—a type of tax shelter the IRS has since deemed unlawful that uses artificial losses to offset taxes on legitimate income. BLIPS is an incredibly complex, multi-stage strategy that involved, among other things, investment in foreign currencies. Namely, the BLIPS scheme used foreign bank loans to speculate in the foreign exchange market.

BLIPS became the targets of numerous civil lawsuits, criminal prosecutions, and government investigations. In all but one cited BLIPS cases, the plaintiff(s) actually obtained financing from a foreign entity, which was then used to purchase or trade in foreign securities. In the one case where the plaintiffs did not receive foreign money, a plaintiff had signed a letter agreement expressing its intent to borrow funds from a foreign bank and a credit agreement, under which the foreign bank agreed to loan the plaintiff $152 million. The non-BLIPS case concerns a similar tax-evasion strategy involving a brokerage account trading in foreign bond options.

Simply put, the cases cited by Salzgitter involved considerable ties to a foreign state, and there was no real question that the parties' legal relationship had a "reasonable relation with one or more foreign states." 9 U.S.C. § 202. In stark contrast, the relationship with Germany in this case is tenuous and does not relate to the legal relationship between Salzgitter and Respondents, but rather focuses on communications Esmark had with Salzgitter's parent corporation.

6

lenient standard district courts should apply when assessing whether the parties' legal relationship bears some reasonable relation with a foreign state. *See* Dkt. 29 at 12–13.

According to Salzgitter, the Resale Contracts "envisaged performance abroad" because they required Salzgitter to perform one of its obligations (i.e., purchase steel) in a foreign state. *See id.* at 11. "Because [Midwest] specifically required that Salzgitter fulfill its contractual obligations by purchasing steel in Canada," Salzgitter argues, "the parties' legal relationship envisaged performance abroad[,] and this Court has subject matter jurisdiction over this action under the New York Convention." *Id.* at 17. Alternatively, Salzgitter claims that the legal relationship between it and Midwest bore a reasonable relation with Canada because "Salzgitter was actually required to purchase steel in Canada." *Id.* at 13.

### 2. *Respondents*

Respondents argue that, "under Texas law, a contract for the sale of goods is performed where the goods are delivered."[6] Dkt. 24 at 13. Thus, because the Resale Contracts "concerned the delivery of steel *in* the United States," they could not have envisaged enforcement of performance abroad. *Id.* at 11–12 (emphasis added). It is Respondents' position that the Resale Contracts expressly envisaged performance in the United States, where Salzgitter was contractually obligated to deliver the steel.

Turning their attention to Salzgitter's argument that its purchase of steel from Algoma at Midwest's direction is sufficient to demonstrate a reasonable relation with Canada, Respondents are quick to highlight that "Salzgitter has failed to cite a single case holding that a requirement that a supplier purchase product from a foreign vendor is alone sufficient to establish a reasonable relationship to a foreign state." *Id.* at 15. Emphasizing the restraint courts should exercise when interpreting jurisdictional statutes, Respondents argue that Salzgitter's purchase of steel to "sell [to Midwest] from a foreign vendor is not enough to invoke the Convention and confer subject matter jurisdiction that is otherwise non-existent." *Id.* at 16.

---

[6] The relevant contracts have choice-of-law provisions mandating that Texas law applies.

**B.     THE PARTIES' LEGAL RELATIONSHIP BEARS A REASONABLE RELATION WITH CANADA**

For the reasons explained below, I find that the arbitral award arises out of a legal relationship that has a reasonable relation with one or more foreign states as required by 9 U.S.C. § 202. Accordingly, I possess subject-matter jurisdiction to adjudicate the parties' claims.[7]

In my view, the dispositive fact in this case is that Midwest directed Salzgitter to purchase steel from Algoma, a company located in Canada. Respondents concede that had Salzgitter failed to purchase steel from the Canadian company, Salzgitter would have been in breach of one of the Resale Contracts. It follows that Salzgitter's interaction with a foreign state was not a random or fortuitous act; rather, it was due to a unilateral decision made by Midwest to specify the location where Salzgitter was required to purchase the steel.

My decision is bolstered by the Fifth Circuit's decision in *Soaring Wind*, which requires me to look "not to the general relationship among the parties but to the foreign character, if any, of the" Resale Contracts themselves. 946 F.3d at 752. For there to be a reasonable relation with a foreign state, "the relationship must contemplate overseas action or involvement," which the Resale Contract clearly does by requiring Salzgitter to purchase steel from Algoma. *Id.* at 753. I also find it instructive that the Fifth Circuit theorized that an agreement between United States citizens requiring meetings to be held in a foreign country or containing a list of mandatory foreign vendors "might be enough" to establish a reasonable relation with a foreign state. *Id.* Certainly, such requirements are far more trivial than the Resale Contract's requirement that Salzgitter purchase steel from a vendor located in a foreign state.

Respondents correctly point out that "Salzgitter has failed to cite a single case holding that a requirement that a supplier purchase product from a foreign vendor is alone sufficient to establish a reasonable relationship with a foreign state and to bring that contract within[] the purview of the Convention." Dkt. 24 at 15. However, the lack of caselaw directly on point is somewhat understandable, given the unique arrangement

---

[7] Because I have determined that the arbitral award arises out of a legal relationship with a foreign state, I need not address Salzgitter's argument that the Resale Contracts envisioned performance abroad.

between Midwest and Salzgitter. Ordinarily, when a United States company purchases goods from a foreign vendor, it does so directly. In that scenario, there is no question the Convention would apply because the commercial relationship is not entirely between United States citizens. *See* 9 U.S.C. § 202. Here, however, Salzgitter acted as the middleman, purchasing the foreign steel—at Midwest's direction and on Midwest's behalf—from Algoma. If Midwest were to simply have told Salzgitter to buy steel at a specific price and allowed Salzgitter to choose the vendor, I do not think my decision would be the same. But the Resale Contract specifically called for Salzgitter to purchase steel from a Canadian company at a price negotiated by Midwest. This is sufficient to demonstrate a reasonable relation with Canada, bringing the arbitral award within the Convention's ambit. *See Soaring Wind*, 946 F.3d at 752–53.

***

Because I have determined I possess jurisdiction over this matter, I must decide the parties' respective motions to confirm, vacate, or modify the arbitral award. But before doing so, I note that Respondents have filed a motion to transfer venue to the Houston Division. *See* Dkt. 28. That motion was on file before the parties consented to proceed before me. As the parties are well aware, I sit in Galveston and Houston and am willing to conduct hearings at either location (or remotely). In fact, at the parties' request, I held the hearing on the Motion to Dismiss in the Houston Federal Courthouse.

Given the change in circumstances, I ask that Respondents inform the Court by Wednesday, June 29, 2022, whether they would like to pursue their venue challenge. Please do not view this request as an indication of how I would rule on the motion to transfer. My motive is strictly to ensure the economical use of judicial resources.

## V. CONCLUSION

For the reasons stated above, Respondents' Motion to Dismiss (Dkt. 24) is **DENIED**.

Respondents are **ORDERED** to inform the Court by Wednesday, June 29, 2022, whether they intend to pursue their pending motion to transfer venue.

Signed on this 24th day of June 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

9