United States District Court
Southern District of Texas
**ENTERED**
September 11, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| SALZGITTER MANNESMANN INTERNATIONAL (USA) INC., | § § § | |
| Petitioner. | § § | |
| V. | § § | CIVIL ACTION No. 3:22-cv-00030 |
| ESMARK, INC., *et al.*, | § § § | |
| Respondents. | § § | |

## OPINION AND ORDER

Petitioner Salzgitter Mannesmann International (USA) Inc. ("Salzgitter") and Respondents Esmark, Inc. ("Esmark") and Sun Steel Company LLC d/b/a Esmark Steel Group Midwest, LLC ("Midwest") (collectively, "Respondents") participated in an arbitration proceeding in Houston, Texas in November 2021. The three-member arbitration panel ruled in Salzgitter's favor in January 2022, awarding $12,689,133.60, plus post-judgment interest, attorneys' fees, and arbitration fees and expenses.

Salzgitter now seeks to confirm the arbitral award, relying on the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, commonly known as the New York Convention, to confer subject matter jurisdiction. I previously determined that the dispute fell within the New York Convention's ambit, providing me with subject matter jurisdiction to hear this dispute. *See Salzgitter Mannesmann Int'l (USA) Inc. v. Sun Steel Co.*, No. 3:22-cv-00030, 2022 WL 2292878 (S.D. Tex. June 24, 2022).

Pending before me are three motions. Salzgitter has moved to confirm or, in the alternative, modify, the arbitral award, *see* Dkts. 22 and 52, and Respondents have moved to vacate the arbitral award. *See* Dkts. 33 (sealed) and 82 (redacted). After reviewing the motions, the applicable law, and hearing oral argument, I

**GRANT** Salzgitter's Motion to Confirm Arbitration Award (Dkt. 22), **DENY** as moot Salzgitter's Motion to Modify Arbitration Award (Dkt. 52), and **DENY** Respondents' Motion to Vacate Arbitration Award (Dkt. 33).

## FACTS

### A.   THE UNDERLYING DISPUTE

For nearly a decade, Midwest regularly engaged Salzgitter to assist with purchases of steel, primarily steel coils, from steel mills in the United States and Canada. In these transactions, Salzgitter would purchase steel directly from the mill and then sell it to Midwest on an extended 120-day payment term. The contract between Salzgitter and Midwest for each individual transaction included a purchase order from Midwest, an order confirmation from Salzgitter, a set of general terms and conditions, and a debt memo from Salzgitter. The parties refer to this constellation of documents papering Salzgitter and Midwest's transactions as "Resale Contracts." Salzgitter performed its obligations under the Resale Contracts by purchasing the steel from the mills selected by Midwest and having the steel shipped to Midwest. Esmark—Midwest's parent company—guaranteed the payments due to Salzgitter under the Resale Contracts through a Guarantee Agreement dated April 21, 2014.

The parties' business relationship was structured under a Master Indemnity and Hold-Harmless Agreement (the "Master Indemnity Agreement") dated July 29, 2011. *See* Dkt. 3-5. The Master Indemnity Agreement contained an arbitration clause, stating "any dispute, controversy or claim arising out of or relating to this Agreement or any Resale Contract . . . shall be settled by arbitration by three neutral arbitrators in accordance with the rules then obtaining of the American Arbitration Association." *Id.* at 5.

In December 2018, Midwest fell behind in its payments, causing Salzgitter to cease transacting business on Midwest's behalf. At the time, Midwest—and Esmark via the Guarantee Agreement—owed Salzgitter over $11 million. The following January, in an effort to get the operation up and running again, Esmark

entered into a payment plan (the "Payment Plan") with Salzgitter to repay the outstanding debt in four quarterly installments plus interest. *See* Dkt. 3-6. After making the first quarterly payment, Esmark defaulted on the Payment Plan.

In October 2019, Salzgitter sued Respondents in Texas state court.

## B.   THE ARBITRATION PROCEEDINGS

On July 17, 2020, pursuant to the Master Indemnity Agreement's arbitration clause, Salzgitter filed a demand for arbitration with the American Arbitration Association ("AAA"). Salzgitter sought an award of actual damages for the separate breaches of the individual Resale Contracts and Payment Plan or, in the alternative, damages for the value of steel delivered to Midwest under the theory of quantum meruit.

Respondents countered that Midwest incurred damages in excess of the amount they owed Salzgitter due to Salzgitter's refusal to continue purchasing steel on Midwest's behalf and sought a total offset based on Salzgitter's alleged breach of an implied promise to continue purchasing steel for Midwest.

Pursuant to the arbitration clause, which incorporated AAA Commercial Rules 13 and 14, the arbitration panel consisted of a neutral chairperson, Alvin Zimmerman ("Arbitrator Zimmerman"), and one arbitrator selected by each party. Salzgitter chose George Shipley ("Arbitrator Shipley"), and Respondents picked Charles Kelly ("Arbitrator Kelly") (collectively, the "Panel").

Rule 17(a) of the AAA Commercial Arbitration Rules and Mediation Procedures ("AAA Rules") requires arbitrators to disclose any "circumstance[s] likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence." AAA Rule 17(a).[1] On September 14, 2020, Arbitrator Shipley disclosed that he had a previous professional and personal relationship with Patrick Mizell of Vinson & Elkins ("V&E"), lead counsel for Salzgitter. Respondents did not object to Arbitrator Shipley's appointment and accepted the

---

[1] AMERICAN ARBITRATION ASSOCIATION, COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES 17 (2016), https://adr.org/sites/default/files/Commercial%20Rules.pdf.

representations in his oath—an oath each member of the Panel took. The Panel members' appointments were confirmed on November 18, 2020.

On December 4, 2020, the Panel held a preliminary hearing, after which the Panel entered a scheduling order. The scheduling order set the final hearing for November 15, 2021, and permitted the parties to conduct basic discovery. Specifically, the Panel allowed each party to submit 25 requests for production, 20 requests for admission, 15 interrogatories, and take three depositions. The parties exchanged multiple rounds of discovery and participated in a total of five depositions. Pursuant to the scheduling order, the parties also submitted pre-hearing briefing, which referenced witnesses, deposition testimony, and documentary evidence.

During the discovery process, the Panel held multiple hearings to resolve various disputes among the parties. These disputes included Salzgitter's motion for leave to file a dispositive motion, dated February 22, 2021; Respondents' motion to reschedule a hearing, dated April 13, 2021; Salzgitter's motion to compel depositions and documents, dated July 23, 2021; and Respondents' motion to reschedule a hearing, dated August 18, 2021.

On August 20, 2021, the parties received an e-mail from the AAA containing an additional disclosure from Arbitrator Shipley. The e-mail stated:

Counsel,

Please see the below supplemental disclosure from Arbitrator George Shipley:

"I have an additional disclosure to make which I do not believe gives rise to justifiable doubt as to my impartiality or independence. My daughter, ███████ started working for Vinson & Elkins on August 2, 2021 as a Business Development Coordinator for the Energy Regulatory Group and the Environmental & Natural Resource Group. She had previously worked for several law firms as a client relations/business development manager or coordinator. After not working for a number of years, she decided to return to work now that her youngest child is starting first grade. ████ reports to Jeff Kostelnik, Senior Business Development Manager. ████ does not know and has never met Mr. Mizell, Ms. Brooke Noble, or Ms. Stephanie Noble."

Please notify the AAA by Friday, August 27, 2021 if either party has any objections to the continued appointment of Arbitrator Shipley. Upon confirmation from the parties that no objections will be filled or no objection by said date, the arbitrator's appointment will be reaffirmed.

4

Dkt. 83 at 2.[2] As discussed later in greater detail, this disclosure is central to Respondents' Motion to Vacate. I feel it is important to mention that Arbitrator Shipley's daughter is not a lawyer and was, instead, employed in a non-lawyer capacity at V&E.

Respondents take issue with the fact that the disclosure occurred 18 days after Arbitrator Shipley's daughter began working for V&E, the law firm representing Salzgitter in the arbitration. Additionally, Respondents contend that "this disclosure necessarily revealed Arbitrator Shipley's failure to disclose that his daughter had *applied for and was interviewing for* a position at [V&E] during the Arbitration proceedings." Dkt. 82 at 6.[3]

On August 27, 2021, Respondents objected to Arbitrator Shipley's continued involvement in the arbitration, pursuant to Rules 18(a) and (c) of the AAA Commercial Rules. *See* Dkt. 84 at 2–4. In a cursory three-paragraph e-mail sent 13 days later, the AAA denied Respondents' request to disqualify Arbitrator Shipley:

> On September 7, 2021 the AAA's Administrative Review Council ("Council") considered the Respondent's objection to the continued service of Arbitrator Shipley and any response received. After careful consideration of the parties' contentions, the Council has determined that Arbitrator Shipley should be reaffirmed as the arbitrator for this case. This decision will be made a part of our administrative file.
>
> The AAA's rule on disqualification provides that an arbitrator shall be subject to disqualification for partiality or lack of independence, inability or refusal to perform his or her duties with diligence and in good faith, and any grounds for disqualification provided by applicable law. The Council has carefully reviewed and considered the parties' submissions in this matter. Based upon the Council's Review Standards available at https://www.adr.org/arc, to which the parties were previously referred, the Council is reaffirming Arbitrator Shipley in this case.
>
> Under the Rules, the AAA's decision regarding an objection to an arbitrator is conclusive. Any additional objection to the continued service of Arbitrator Shipley must be based on new grounds. The next steps for this case are to move forward in this case in accordance with the Scheduling Order and Procedural Order #2.

Dkt. 35-7. This decision was binding and conclusive. *See* AAA Rule 18(c).

---

[2] This is the redacted version of Dkt. 33-5. The name of Arbitrator Shipley's daughter has, by agreement of the parties, been redacted from this document. *See* Dkt. 81 (ordering many filings in this case unsealed and others to be filed with redactions).

[3] This is the redacted version of Respondents' Motion to Vacate (Dkt. 33).

From November 15 through November 17, 2021, the Panel held a three-day final arbitration hearing, at which the parties' witnesses were subject to live cross-examination, and each side submitted documentary evidence. Respondents contend they were openly prejudiced by several of the Panel's rulings in which, Respondents argue, the Panel "arbitrarily enforced certain AAA rules against Esmark's counsel, while not applying these same rules against the lawyers at [V&E], the employer of Arbitrator Shipley's daughter." Dkt. 82 at 7. Because this case centers on, at least in part, the final hearing and Arbitrator Shipley's supposed bias, I will discuss Respondents' specific grievances in greater detail in the following section.

On December 20, 2021, the parties submitted extensive post-hearing briefing, which included references to hearing testimony and answers to questions submitted by the Panel. Several of those questions were directed toward Salzgitter's claim against Midwest and whether Midwest had been released of its payment obligations to Salzgitter by terms of the Payment Plan. Ten days later, on December 30, 2021, the Panel issued a procedural order closing the evidentiary stage of the proceedings.

On January 26, 2022, after reviewing and considering the evidence presented, witness testimony, and the parties' arguments, the Panel issued its award, finding against Respondents. The Panel awarded damages to Salzgitter under two separate contractual arrangements: (1) the Payment Plan between Esmark and Salzgitter; and (2) the series of Resale Contracts between Midwest and Salzgitter. *See* Dkt. 3-1. Arbitrator Kelly dissented as to the judgment against Midwest on one issue, finding that the Payment Plan released Midwest from its obligations under the Resale Contracts, but otherwise joined the Panel's decision. *See id.* at 30.

## C.   RESPONDENTS' PROFFERED EVIDENCE OF BIAS

To hear Respondents tell it, Arbitrator Shipley "and the Panel he influenced" demonstrated "clear bias in favor of [V&E] and its client from the very start of the

proceedings." Dkt. 82 at 7. However, Respondents offer only a handful of examples.

On the first day of the final hearing, allegedly in violation of the Panel's scheduling order, the Panel "allowed [V&E] to submit evidence related to attorneys' fees incurred by Salzgitter in the arbitration." *See id*. Then, on day two, the Panel, over Respondents' objection, admitted what Respondents characterize as "a highly prejudicial" e-mail sent by a former Salzgitter employee who was neither subpoenaed nor deposed and, thus, could not be cross-examined regarding the e-mail's content. *Id*. at 8. Also on day two, the Panel "cautioned Esmark's counsel to limit his inquiry into a viable defense to non-performance on grounds that it was not included in Esmark's Answer to Salzgitter's Demand for Arbitration." *Id*.

When "actually permitted to get evidence into the record," Respondents continue, the Panel showed partiality and prejudice toward Respondents. *Id*. at 8–9. For example, Respondents complain that Arbitrator Zimmerman interjected and objected on Salzgitter's behalf during Respondents' counsel's examination of a witness. *See id*. at 9 (citing Dkt. 35-8 at 21). In another instance, Respondents claim that Arbitrator Shipley "took it upon himself to repeatedly pressure" one of Respondents' witnesses "to admit liability on behalf of Esmark." *Id*. at 9 (citing Dkt. 35-8 at 22–24); *see also id*. at 10 ("Arbitrator Shipley was prepared to ask the same question several times to get favorable testimony for Salzgitter on the ultimate issue in the case."). Respondents also complain that Arbitrator Zimmerman, on behalf of the Panel, "caution[ed]" one of their key witnesses to be more concise in his answers "without any objection or prompting by opposing counsel." *Id*. at 10.

These examples, Respondents conclude, demonstrate the Panel's actual bias and require me to vacate the arbitral award "to allow the matter to be heard by a truly impartial panel." *Id*. at 14.

## PROCEDURAL HISTORY

On January 27, 2022, Salzgitter filed this action to confirm the arbitral award. *See* Dkt. 1. The parties consented to proceed before me in May 2022. *See* Dkt. 56. After I determined the Court has subject matter jurisdiction to decide the parties' respective motions to confirm, modify, or vacate the arbitral award, I turned my attention to those motions.

Given that much of Respondents' partiality argument hinges on Arbitrator Shipley's alleged bias and failure to disclose that his daughter had applied for and interviewed with V&E, I allowed Respondents to conduct post-arbitration discovery regarding their claims and to supplement the record with references to such discovery. *See* Dkt. 78; *see also* Dkts. 57, 74, and 77 (parties' respective arguments for and against such discovery).

As a brief overview, I ordered V&E to produce certain documents and communications concerning Arbitrator Shipley's daughter's employment aimed at determining whether anyone, including Arbitrator Shipley, had recommended that V&E hire her, as well as any communications between Arbitrator Shipley and partners in V&E's Houston office regarding the arbitration or his daughter's employment. I also ordered Arbitrator Shipley's daughter to sit for a deposition.

There proved to be few, if any, responsive documents or communications. As for the deposition, Arbitrator Shipley's daughter testified that she applied to V&E via an online application process on May 19, 2021. *See* Dkt. 79-1 at 16, 20. Although her father was aware she "was looking to go back to work" in May 2021, she does not recall discussing the specific firms she applied to with him. *Id.* at 16–17. Arbitrator Shipley's daughter went through three rounds of interviews before receiving an offer from V&E on June 28, 2021. *See id.* at 22, 24.[4] She testified that

---

[4] The transcript of Arbitrator Shipley's daughter's deposition erroneously states that she received an offer of employment from V&E on June 28, 2022. Given that this matter was not instituted until 2022, *after* the arbitral award had issued, that date is obviously incorrect. The parties do not dispute that Arbitrator Shipley's daughter was employed at V&E in 2021, not 2022.

she informed her father of her relationship with V&E "at some point between when [she] received the offer" on June 28, 2021, "and when [she] started" at V&E on August 2, 2021. *See id.* at 24, 28. She further testified that she did not believe her father knew about her job at V&E before she told him. *See id.* at 27. To be clear, there is nothing in the record that suggests that Arbitrator Shipley knew that his daughter had applied for a job at V&E and was interviewing for a position at the firm before she received a job offer.

Arbitrator Shipley's daughter did not stay employed at V&E for long. She left V&E on December 2, 2021, a mere four months after she started her employment, when her husband was transferred to Angola for his job. The Panel did not issue its final award until January 26, 2022—roughly seven weeks after Arbitrator Shipley's daughter had departed V&E.

Below is a complete timeline of the relevant events learned during the post-arbitration discovery:



## LEGAL STANDARD

### A.   THE NEW YORK CONVENTION AND THE FEDERAL ARBITRATION ACT

A bit of housekeeping first. Salzgitter has moved to confirm the arbitral award under the New York Convention. Respondents have moved to vacate the arbitral award under the Federal Arbitration Act ("FAA"). As mentioned, I have already decided that the New York Convention governs the arbitral award at issue in this case.

"[T]he FAA and the New York Convention work in tandem, and they have overlapping coverage to the extent that they do not conflict." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 102 n.1 (2d Cir. 2006) (quotation omitted). Under the New York Convention, when an arbitration is conducted in the United States, "the domestic provisions of the FAA also apply, as is permitted by Articles V(1)(e) and V(2) of the New York Convention." *Scand. Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012); s*ee also Gulf Petro Trading Co. v. Nigerian Nat'l Petrol. Corp.*, 512 F.3d 742, 746 (5th Cir. 2008) (holding that courts in countries in which awards are made—i.e., primary-jurisdiction courts—are "free to set aside or modify an award in accordance with the country's domestic arbitral law and its full panoply of express and implied grounds for relief" (cleaned up)); *Saipem Am., Inc. v. Wellington Underwriting Agencies, Ltd.*, No. 4:07-cv-03080, 2008 WL 2276210, at *1 (S.D. Tex. Mar. 18, 2008) ("Thus, a court in the country under whose law the arbitration was conducted may apply domestic arbitral law, such as the FAA, to a motion to set aside or vacate that arbitral award."), *aff'd sub nom. Saipem Am. v. Wellington Underwriting Agencies Ltd.*, 335 F. App'x 377 (5th Cir. 2009).

Thus, because the arbitral award was made in and under the laws of the United States, the FAA applies to Respondents' motion to vacate.

### B.   JUDICIAL REVIEW OF ARBITRATION AWARDS

Given the strong federal policy favoring arbitration, "[j]udicial review of an arbitration award is extraordinarily narrow." *Antwine v. Prudential Bache Sec.,*

*Inc.*, 899 F.2d 410, 413 (5th Cir. 1990). Indeed, the Fifth Circuit has described it as "among the narrowest known to the law." *Del Casal v. E. Airlines, Inc.*, 634 F.2d 295, 298 (5th Cir. Unit B Jan. 1981). "Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) (an arbitrator's decision will be vacated "only in very unusual circumstances"). Accordingly, I must "defer to the arbitrator's decision when possible." *Antwine*, 899 F.2d at 413. This deference is "needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008). I am not permitted to vacate an arbitrator's decision simply because I disagree with the result of the arbitration or because I believe that the arbitrator made a serious legal or factual error. *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013).

The FAA provides the exclusive grounds for vacating an arbitration award. Under the FAA, an arbitration award may be vacated under the following limited circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;

> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). Only the second scenario—evident partiality or corruption—is at issue in this case.[5]

## C.  EVIDENT PARTIALITY

A party moving to vacate an arbitration award under § 10(a)(2) must "establish evident partiality by demonstrating either that [the arbitrator] failed to disclose relevant facts or that he displayed actual bias at the arbitration proceeding." *Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F. Supp. 2d 545, 549 (N.D. Tex. 2006). "In a failure to disclose case, the integrity of the process by which arbitrators are chosen is at issue; in an actual bias case, the integrity of the arbitrators' decision is at issue." *Id.*

Regardless of whether partiality is alleged through nondisclosure or actual bias, the meaning of evident partiality remains the same, as construed by the Fifth Circuit:

> On its face, "evident partiality" conveys a stern standard. Partiality means bias, while evident is defined as clear to the vision or understanding and is synonymous with manifest, obvious, and apparent. The statutory language, with which we always begin, seems to require upholding arbitral awards unless bias was clearly evident in the decisionmakers.

*Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 281 (5th Cir. 2007) (quotation omitted).

Vacatur of an arbitral award is a "draconian remedy." *Id.* at 286. The Fifth Circuit has held in unambiguous terms that the mere failure to disclose a conflict is insufficient. *See id.* at 285 ("[R]equiring vacatur based on a mere appearance of bias for nondisclosure would hold arbitrators to a higher ethical standard than federal Article III judges."). Rather, vacatur based on nondisclosure "is only

---

[5] Respondents cite to 9 U.S.C. § 10(a)(1)—where the award was procured by corruption, fraud, or undue means. *See* Dkt. 82 at 11. However, this appears to be an oversight, as Respondents expressly argue only evident partiality. *See id.* ("Under the [FAA], the Court may vacate an arbitration award where there was evident partiality or corruption in the arbitrators, or either of them." (quotation omitted)).

warranted upon nondisclosure that involves a significant compromising relationship," and the act of nondisclosure "creates a concrete, not speculative impression of bias." *Id.* at 286.

"To establish evident partiality based on actual bias, the party urging vacatur must produce specific facts from which a reasonable person would have to conclude that the arbitrator was partial to one party." *Householder Grp. v. Caughran*, 354 F. App'x 848, 852 (5th Cir. 2009) (quotation omitted). This is an "onerous burden" of proof. *Weber*, 455 F. Supp. 2d at 550. To carry its burden, the urging party "must demonstrate that the alleged partiality is direct, definite, and capable of demonstration rather than remote, uncertain or speculative." *Householder Grp.*, 354 F. App'x at 852 (quotation omitted). I must resolve any doubts or uncertainties in favor of upholding the award. *See OOGC Am., L.L.C. v. Chesapeake Expl., L.L.C.*, 975 F.3d 449, 453 (5th Cir. 2020).

## ANALYSIS

Respondents have moved to vacate, arguing, "[t]here is no such thing as impartiality when it comes to the father–daughter relationship, and it is naïve to assume that Arbitrator Shipley, no matter how disciplined or self-regulating he may be, would be able to effectively walk that tightrope." Dkt. 82 at 2.

Because Arbitrator Shipley disclosed his daughter's employment during the arbitration proceedings, and because the potential conflict did not exist at the time Arbitrator Shipley was appointed to the Panel, this case does not look like your typical failure-to-disclose case. Perhaps recognizing this fact, Respondents advance two arguments as to why I must vacate the award: (1) Arbitrator Shipley failed to disclose that his daughter was applying to and interviewing with V&E; and (2) the Panel demonstrated actual bias during the final hearing. In the event I conclude that the arbitral award should be confirmed, Midwest argues that the award cannot be enforced against Midwest because the arbitration "panel failed to identify Midwest as an entity that was liable to Salzgitter." Dkt. 32 at 6. I address these arguments one-by-one below.

## A.   FAILURE TO DISCLOSE

First, Respondents allege that Arbitrator Shipley acted with "evident partiality" when he failed to disclose that his daughter had applied to and interviewed with V&E.[6] This argument, of course, does not gain traction because, as mentioned, nothing in the record indicates that Arbitrator Shipley knew, at the time, that his daughter had applied for a job at V&E and had been interviewed by the firm. The real criticism lodged by Respondents against Arbitrator Shipley is that he unquestionably knew by August 2, 2021—his daughter's first day of work at V&E—about a possible conflict and failed to disclose the purported conflict for 18 days, until August 20, 2021.

In *Commonwealth Coatings Corp. v. Continental Casualty Co.*, the Supreme Court held that an arbitrator's award may be vacated when the arbitrator fails to disclose an ongoing financial relationship between the arbitrator and a

---

[6] In Salzgitter's view, this cannot be construed as a nondisclosure case because Shipley disclosed his daughter's employment before the final hearing, which gave Respondents time to appeal his continued service on the Panel. Respondents, on the other hand, argue that I must look at the facts that were disclosed to decide whether this is a nondisclosure case. Frankly, I am not sure this distinction truly matters in light of the Fifth Circuit's decision in *Positive Software*, which instructs me to ask whether the nondisclosure involves a significant compromising relationship. *See* 476 F.3d at 286. However, to the extent it matters, I find that this type of mid-arbitration disclosure cannot evade judicial review simply because it occurred before the final hearing. With that said, I make the following observations: Arbitrator Shipley supplemented his disclosures to notify the parties of the potential conflict on August 20, 2021—within 18 days after his daughter began her employment with V&E. Testimony establishes that Arbitrator Shipley learned of the potential conflict sometime *after* his daughter had received an offer from V&E on June 28, 2021. *See* Dkt. 79-1 at 24, 27. But even if I were to look back to when Arbitrator Shipley's daughter first applied to V&E (May 19, 2021), aside from ruling on a motion for continuance—where the Panel ruled against Salzgitter—nothing occurred in the arbitration proceedings from May 19, 2021 until Arbitrator Shipley's disclosure on August 20, 2021. Certainly the Panel's decision to rule against Salzgitter on the motion for continuance cannot serve as evidence that Arbitrator Shipley acted partially against Respondents. However, this factor is more properly analyzed when considering whether Respondents have demonstrated evident partiality under a theory of actual bias. *See Householder Grp.*, 354 F. App'x at 852.

party to the arbitration. 393 U.S. 145, 147–49 (1968) (plurality opinion).[7]
Cognizant of the need for arbitrators to have specialized knowledge of the subject
matter they are arbitrating, the Supreme Court did not require arbitrators to "sever
all their ties with the business world." *Id.* at 148. Rather, the Court imposed "the
simple requirement that arbitrators disclose to the parties any dealings that might
create an impression of possible bias." *Id.* at 149.

The Fifth Circuit narrowly construed this disclosure requirement in *Positive
Software*, fearing that if any prior relationship between an arbitrator and a party
required vacatur, it would "jeopardize the finality of arbitration" because "losing
parties would have an incentive to conduct intensive, after-the-fact investigations
to discover the most trivial of relationships, most of which they likely would not
have objected to if disclosure had been made." 476 F.3d at 285. The Fifth Circuit
was also concerned that awarding vacatur due to an insubstantial relationship
would "rob arbitration of one of its most attractive features apart from speed and
finality—expertise." *Id.* With these policy rationales in mind, the Fifth Circuit held
that an award "may not be vacated because of a trivial or insubstantial prior
relationship between the arbitrator and the parties to the proceeding." *Id.* at 283.
Instead, "[t]he draconian remedy of vacatur is only warranted upon nondisclosure
that involves a *significant compromising relationship*." *Id.* at 286 (emphasis
added). Thus, the primary inquiry for me is whether the tertiary relationship
between Arbitrator Shipley and Salzgitter—via Arbitrator Shipley's daughter's
four-month employment at V&E, the international law firm representing Salzgitter
in the arbitration—constitutes a "significant compromising relationship."

Courts have articulated four factors to aid in determining whether the
nondisclosure involves the type of significant compromising connection to a party
in the arbitration that warrants vacatur:

---

[7] Or majority opinion, depending on whom you ask. *See Burlington N. R.R. Co. v. TUCO
Inc.*, 960 S.W.2d 629, 633 (Tex. 1997) (criticizing "some lower federal courts" for "treating
Justice Black's opinion as a mere plurality").

> (1) any personal interest, pecuniary or otherwise, the arbitrator has in the proceeding; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor, keeping in mind that the relationship must be substantial, rather than trivial, in order to establish evident partiality; (3) the relationship's connection to the arbitration; and (4) the proximity in time between the relationship and the arbitration proceeding.

*Hobet Mining, Inc. v. Int'l Union, United Mine Workers of Am.*, 877 F. Supp. 1011, 1021 (S.D. W. Va. 1994) (cleaned up).

Beginning with the first factor, Arbitrator Shipley had no financial or personal interest in the outcome of the dispute between Salzgitter and Respondents that would suggest partiality toward Salzgitter. As for the fourth factor, while the father–daughter relationship obviously existed simultaneously with the arbitration proceeding, Arbitrator Shipley's daughter did not apply to V&E until a full six months after Arbitrator Shipley had been confirmed to the Panel. Thus, with respect to the second factor, it cannot be said that the relationship between Arbitrator Shipley and Salzgitter—the party he is alleged to favor—is direct or substantial. Neither V&E nor Arbitrator Shipley's daughter were parties to the arbitration. *See Weber*, 455 F. Supp. 2d at 552 (noting that courts have found partiality where an arbitrator fails to disclose the professional positions of their family members "when the positions were closely related to *a party* to the arbitration" (emphasis added)); *Fontaine v. Sport City Toyota*, No. 3:11-cv-2400, 2012 WL 6000629, at *2 (N.D. Tex. Dec. 3, 2012) ("[C]ourts rarely find evident partiality without the arbitrator's having a business relationship or other interest relating to one of the parties." (collecting cases)).

Consequently, even though Arbitrator Shipley might be inclined to favor his daughter in a dispute involving her, such favoritism cannot be presumed to carry over to a company represented by the law firm that once employed his daughter. In addition, as to the third factor, the relationship between Arbitrator Shipley and his daughter creates only an indirect and tenuous relationship between Arbitrator Shipley and Salzgitter. Arbitrator Shipley's daughter has no discernable interest in

the outcome of the dispute between Salzgitter and Respondents. Rather, Arbitrator Shipley's daughter's interest, as an employee of V&E, was in a non-lawyer capacity and concerned matters having no connection with the dispute between Salzgitter and Respondents. Thus, any connection between the father–daughter relationship and the dispute heard by Arbitrator Shipley is speculative at best.

All said, Arbitrator Shipley's supplemental disclosure was timely and reasonable, and his daughter's employment at V&E is not the type of significant compromising relationship that would warrant vacatur of the arbitral award.

Indeed, courts have refused vacatur where the undisclosed connections were much stronger. For example, in *Peoples Security Life Insurance Co. v. Monumental Life Insurance Co.*, the Fourth Circuit denied vacatur where the arbitrator—a former federal district judge—failed to disclose that a partner at his law firm represented one of the parties to the arbitration. *See* 991 F.2d 141, 147 (4th Cir. 1993). In that case, six months after the arbitration proceedings began, and after the conclusion of testimony on the issue of liability, an attorney who represented one of the parties to the arbitration, Peoples Security Life Insurance ("Peoples Security"), in district court before the case went to arbitration joined the arbitrator's law firm as a partner in its Washington, D.C. office. *See id.* at 145. The attorney had withdrawn as Peoples Security's counsel before the case went to arbitration based on a conflict. *See id.* at 145 n.5. Faced with those facts, the Fourth Circuit found that the partner's representation of a party to the arbitration was insufficient grounds for finding evident partiality because the arbitrator "had not been involved in the litigation between the two parties." *Id.* at 146; *see also, e.g.*, *Consol. Coal Co. v. Loc. 1643, United Mine Workers of Am.*, 48 F.3d 125, 129 (4th Cir. 1995) (finding no per se bias where arbitrator did not disclose that his brother was employed by an international union whose district was involved in arbitration).

The most analogous case I have found is *Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds*, 748 F.2d 79 (2d Cir. 1984).

In that case, the Second Circuit vacated an arbitration award because the sole arbitrator was the son of a senior official of a union involved in the controversy. *See id.* at 84. More specifically, the arbitrator's father was a vice president of the international union and a trustee of the district union, which was a party to the arbitration. During the pendency of the arbitration, the arbitrator's father became the general president of the international union.

The Second Circuit began its analysis by noting that what constitutes evident partiality in light of the Supreme Court's decision in *Commonwealth Coatings* remained "a troublesome question." *Id.* at 82. In an effort to harmonize the Supreme Court's plurality decision, the Second Circuit rejected the "mere appearance of bias" standard but determined that requiring "proof of actual bias" would be insurmountable. *Id.* at 83–84. Thus, the appellate court struck a balance between the two, holding that "'evident partiality' . . . will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Id.* at 84.

The Second Circuit knew nothing substantive about the strength of the father–son relationship. *See id.* ("We do not know how close they are, or how independent the son is of the father, or how divergent their views on the issues giving rise to the arbitrated dispute."). Rather, casting themselves in the role of reasonable people, the court felt that it was "bound by [its] strong feeling that sons are more often than not loyal to their fathers, partial to their fathers, and biased on behalf of their fathers." *Id.* Thus, taking a common-sense view of father–son relationships, the Second Circuit stated that it could not "in good conscience allow the entering of an award grounded in what [it] perceive[d] to be such unfairness." *Id.*

A few thoughts. First, *Positive Software*, not *Morelite*, guides my analysis. *See generally Consol. Coal*, 48 F.3d at 129 (reasoning that a court should not simply assume partiality based on a familial relationship when discussing *Morelite*). But more importantly, the father–son relationship in *Morelite*

18

seemingly fits within the narrow "significant compromising relationship" exception carved out by the Fifth Circuit in *Positive Software*. Indeed, where the sole arbitrator's father is the general president of the union involved in the arbitration dispute, nondisclosure of such information leaves one with a concrete—not speculative—impression of bias. *See Positive Software*, 476 F.3d at 284 (observing the relationship at issue in that case "pale[d] in comparison" to that in *Morelite*).

In contrast, as explained above, no such significant compromising relationship exists in this case. Arbitrator Shipley's daughter has no direct ties to Salzgitter. Instead, at the absolute most, she had a peripheral connection through her former employer. Respondents' speculative arguments regarding the lawyers who represented Salzgitter wielding some sort of authority over Arbitrator Shipley's daughter's employment, *see* Dkt. 54 at 8, or there being "no such thing as impartiality when it comes to the father–daughter relationship," Dkt. 82 at 2, are precisely the type of speculative partiality the Fifth Circuit warned against in *Positive Software* when it rejected the "mere appearance of bias" standard.

All that said, it deserves repeating that this is not a case in which Arbitrator Shipley kept a potential conflict close to his chest, refusing to disclose the potential conflict at all. This is also not a situation in which Arbitrator Shipley conveniently waited to make a disclosure until after the issuance of a final award. In stark contrast, Arbitrator Shipley disclosed the potential conflict on August 20, 2021, several months before the final arbitration hearing in this matter even began. Although I understand that Respondents wish Arbitrator Shipley had disclosed his daughter's relationship with V&E at an earlier date, it is hard to comprehend what potential prejudice Respondents encountered by the August 20, 2021 disclosure. Respondents do not articulate what difference it would have made if Arbitrator Shipley had made the disclosure on August 2, 2021, his daughter's first day of work at V&E. To top it all off, by the time the arbitration award was issued in January 2022, Arbitrator Shipley's daughter had left V&E and moved to Africa with her

family. This further weakens Respondents' argument that Arbitrator Shipley's daughter's employment with V&E caused Arbitrator Shipley to be biased against Respondents.

Accordingly, for the reasons explained above and in the following section, I find that Respondents have failed to demonstrate the type of "significant compromising relationship" required for me to vacate the arbitral award.

## B.   ACTUAL BIAS

When actual bias is alleged, "the integrity of the arbitrators' decision is at issue." *Weber*, 455 F. Supp. 2d at 549. "To establish evident partiality based on actual bias, the party urging vacatur must produce specific facts from which a reasonable person would have to conclude that the arbitrator was partial to one party." *Householder Grp.*, 354 F. App'x at 852 (quotation omitted). Under this "onerous burden," the moving party "must demonstrate that the alleged partiality is direct, definite, and capable of demonstration rather than remote, uncertain or speculative." *Id.* (quotation omitted).

Respondents argue that "Arbitrator Shipley and the Panel" displayed actual bias, directing me to a handful of decisions made during the final hearing. Respondents' "actual bias" argument is quite attenuated, given that most of the complained-of decisions were made by Arbitrator Zimmerman, not Arbitrator Shipley. But, to hear Respondents tell it, Arbitrator Shipley wielded clandestine influence over the Panel's decisions.

I address each Panel decision about which Respondents complain below. But before I begin, I note that the record does not contain a full copy of the final hearing transcript. Instead, the parties have submitted excerpts. *See* Dkts. 35-8 (Respondents) and 51-14 (Salzgitter). Salzgitter's excerpt is more comprehensive— totaling 152 pages compared to the 27 pages submitted by Respondents—and includes portions that provide insight into the complained-of decision. Given that I must resolve all doubts and uncertainties in favor of upholding the award, *see*

*OOGC*, 975 F.3d at 453, it seems elementary that one should include the entire transcript so as to paint a complete picture.

### 1. *The Panel's Decision to Allow V&E to Submit Evidence Related to Attorneys' Fees*

Respondents complain that the Panel's decision to allow evidence related to attorneys' fees on day one of the final hearing was in direct violation of the parties' scheduling order. *See* Dkt. 82 at 7. "Nevertheless," according to Respondents, "the Panel held that [V&E] could submit such evidence 'if it was their pleasure' and to submit further documentation at a later date as well." *Id.* at 7–8 (citing Dkt. 35-8 at 3–5). Respondents emphasize the Panel's "if it was their pleasure" comment, implying the Panel bent over backwards to accommodate Salzgitter. *See id.*

First, the parties' scheduling order merely provided: "**Attorneys' fees.** Should the Panel include in its award a determination that one party should reimburse another for some or all of its attorneys' fees, the [a]ward shall include a procedure for determining the dollar amount of that reimbursement." Dkt. 51-2 at 6. I fail to see how the Panel's decision to allow V&E to submit evidence of attorneys' fees at the hearing, with additional evidence being provided at a later date, contravenes the letter or spirit of the scheduling order.

Further, the Panel's decision was not prejudicial to Respondents. The Panel expressly told Respondents' counsel that not presenting evidence of attorneys' fees at the hearing was "not going to be held against" Respondents. Dkt. 51-14 at 15. Respondents' counsel was further advised that he could submit the evidence on attorneys' fees as he deemed appropriate if that was *his*—not Salzgitter's counsel's—pleasure. *See id.* And Respondents did, in fact, present evidence of attorneys' fees after the final hearing. *See* Dkt. 51-15 at 5.

But most importantly, the complained-of decision was made by Arbitrator Zimmerman,[8] not Arbitrator Shipley. *See* Dkt. 51-14 at 14–15. Unfortunately, this is a pattern that permeates nearly all Respondents' "actual bias" arguments.

### 2. *The Panel's Decision to Admit a "Highly Prejudicial" E-mail*

Respondents further complain that the Panel, over Respondents' objection, admitted what Respondents characterize as "a highly prejudicial" e-mail sent by a former Salzgitter employee who was neither subpoenaed nor deposed and, thus, was not subject to cross-examination. Dkt. 82 at 8 (citing Dkt. 35-8 at 7–13).

Once again, Arbitrator Zimmerman, not Arbitrator Shipley, overruled the complained-of objection. *See* Dkt. 35-8 at 9. However, Arbitrator Zimmerman did not reject Respondents' objection outright. Instead, he noted that the Panel would "give [the evidence] whatever weight we feel is appropriate, in light of the objection that's been raised."[9] *Id*. Not only is the admission of this piece of evidence insufficient to demonstrate actual bias, but the AAA Rules specifically provide that the traditional rules of evidence do not apply and that "parties may offer such evidence as is relevant and material to the dispute." AAA Rule 34(a); *see Forsythe*

---

[8] Arbitrator Zimmerman initially told Salzgitter's counsel that it could present evidence of attorneys' fees at the end of the hearing, if time permitted, but would let the parties put on their fact witnesses and "hold back" on Salzgitter presenting any evidence of attorneys' fees. Dkt. 51-14 at 16. After Salzgitter's counsel informed the Panel he intended to rest around 4:00 p.m., Arbitrator Zimmerman asked Respondents' counsel if he was "prepared to begin [his] case in chief" if Salzgitter rested by then. *Id*. at 17. Respondents' counsel stated that he would "strongly prefer" starting his case in chief on day two, at which point Arbitrator Zimmerman decided to allow Salzgitter to use the extra time to present evidence of its attorneys' fees.

[9] For what it's worth, the Panel overruled many of Salzgitter's objections, as well. Based on the admittedly incomplete transcript before me, it appears Salzgitter objected during the final hearing a total of 17 times, five of which were sustained, eight overruled, and Respondents' counsel changed his questioning in response to the other four objections. *See* Dkt. 51-14 at 11 (counsel rephrased); *id*. at 12–14 (overruled); *id*. at 28–32 (sustained); *id*. at 33 (overruled); *id*. at 34–39 (overruled); *id*. at 42 (sustained); *id*. at 43 (overruled); *id*. at 44 (sustained); *id*. at 45 (overruled); *id*. at 46–47 (counsel rephrased); *id*. at 47–49 (overruled); *id*. at 50–51 (counsel stopped line of questioning); *id*. at 56–57 (sustained); *id*. at 133 (counsel struck question); *id*. at 134–43 (overruled); *id*. at 144–45 (overruled); *id*. at 149–50 (sustained).

*Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022 (5th Cir. 1990) ("Submission of disputes to arbitration always risks an accumulation of procedural and evidentiary shortcuts that would properly frustrate counsel in a formal trial."). To fault the Panel for not imposing the rigorous procedural limitations and evidentiary strictures found in state and federal courts would stand at odds with the norms of arbitration, which was designed to avoid such limitations.

On a final note, Respondents fail to explain the prejudice caused by the admission of the e-mail. Instead, they offer only the out-of-pocket argument that it "dealt with a major issue in the case." Dkt. 82 at 8. Setting aside the fact that Arbitrator Shipley did not rule on this objection, it is Respondents' burden to produce "specific facts from which a reasonable person would have to conclude that the arbitrator was partial to one party." *Householder Grp.*, 354 F. App'x at 852 (quotation omitted). A conclusory assertion that the e-mail at issue concerned a "major issue in the case" is patently insufficient.

### 3. The Panel's Decision to Limit Respondents' Inquiry into a Defense of Non-Performance

Respondents next argue that the Panel "cautioned Esmark's counsel to limit his inquiry into a viable defense to non-performance on grounds that it was not included in Esmark's Answer to Salzgitter's Demand for Arbitration." Dkt. 82 at 8. Respondents point out that the AAA Rules place no limit on when a party may raise an affirmative defense. *See id.* at 8 n.1. (citing AAA Rule 5(a) and Rule 6(b)).

When Salzgitter's counsel objected to Respondents putting on evidence of non-performance, he noted that it was neither a claim nor counterclaim that had been pleaded by Respondents. *See* Dkt. 35-8 at 14. Arbitrator Zimmerman—again, not Arbitrator Shipley—allowed Respondents' counsel to respond, heard argument by both parties' counsel, and took the objection under advisement. *See id.* at 14–19. Arbitrator Zimmerman then allowed Respondents' counsel to proceed while also noting that Salzgitter's counsel had a running objection to the line of questioning. *See id.* at 20. However, when Respondents' counsel pointed out that

the AAA Rules are construed liberally, Arbitrator Zimmerman responded, "the Panel adjusts and sets rules as we go." Dkt. 51-14 at 41.

Once again, arbitrators have a "wide latitude" to conduct their proceedings and are not bound by judicial rules of evidence or procedure. *Halliburton Energy Servs. v. NL Indus.*, 553 F. Supp. 2d 733, 783 (S.D. Tex. 2008). Similarly, to the extent Respondents argue that Arbitrator Zimmerman's ruling departs from the AAA's own rules, such a departure does not support vacatur. *See Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680 (7th Cir. 1983) (observing that the rules of arbitration "are not the proper starting point for an inquiry into an award's validity under [the FAA]" because the AAA Rules "do not have the force of law").

### 4. Arbitrator Zimmerman's Comments on the Record

Broadly speaking, Respondents complain that Arbitrator Zimmerman interjected, made disparaging comments, and even objected on Salzgitter's behalf. The complained-of conduct occurred during Respondents' counsel's examination of Roberto Alvarez ("Alvarez"). I will first summarize Respondents' arguments before addressing whether Arbitrator Zimmerman's conduct evinces partiality that rises to the level of actual bias.

Beginning with the claim that Arbitrator Zimmerman objected "on behalf of" Salzgitter's counsel, I note the Respondents' excerpt does not include the testimony leading up to Arbitrator Zimmerman's interposition. However, Salzgitter has included that testimony as part of its response. Although Arbitrator Zimmerman did interject, stating that Salzgitter's counsel "would love to stand up and say leading questions," Dkt. 51-14 at 65, his statement was not exactly unprovoked. Rather, the remark was preceded by a series of leading questions, and Arbitrator Zimmerman did not interrupt the Respondents' counsel's line of questioning.

Q:   Mr. Meiser suggested to us under oath that in the German language [the] word "eventual" may also mean maybe or might. Is that correct?

A:      I would have to look up, you know, the dictionary to make that
        determination, yeah. You could use it in that sense.

Q:      Let me ask you this question: When you use the word
        "eventually" in that e-mail that you were berated by [Salzgitter's
        counsel], did you mean -- when you said it would eventually go
        away, do you mean that it might go away or that eventually it
        would go away?

A:      The question might go away? Maybe, I don't know.

Q:      You know how to speak English, don't you?

A:      Yes.

Q:      And is it fair to say that if you meant it might go away, you would
        say it might go away?

A:      Yes.

Q:      And is it fair to say that maybe the problem would go away?

A:      Yes.

Q:      And if you wanted to say that eventually the problem would go
        away, that's what you'd say?

A:      I would use that word "eventually," ja, because I would not be
        able to pinpoint, ja, a certain time.

Q:      Okay.

A:      So that's in that sense where I would use it.

Q:      So the uncertainty, in your mind, came as to the timing the
        problem would go away?

A:      Yes.

Q:      Okay. That's how I always understood the word "eventually,"
        too. Let's go back to [Salzgitter's counsel's] creative suggestion
        that you just take back the steel to make this whole problem go
        away.

Zimmerman:   By the way, you know that [Salzgitter's counsel] would
             love to stand up and say leading questions, objection.

Counsel:     But he's restrained himself.

Zimmerman:   Well, he was thinking about it on those last couple [of
             questions].

Counsel:     So now he only has to think objections for the Panel.
             That's pretty good, too. Goes to another step. Is he
             thinking anything now that I should know about?

> [Salzgitter's counsel] might be thinking [of] an objection,
> but we're going to hold him to the standard of articulating
> it for it to be sustained.

Dkt. 51-14 at 64–66. After that, Respondents' counsel continued with his re-direct of Alvarez.

In its response to Respondents' Motion to Vacate, Salzgitter points to other instances where Respondents' counsel asked leading questions on direct examination, noting that the Panel overruled its objections unless they went to a "core question." Dkt. 50 at 21 nn.42–43.

Next, Respondents complain that Arbitrator Zimmerman, on behalf of the Panel, issued the following unsolicited "caution" to Alvarez without objection or prompting by opposing counsel:

| | |
|---|---|
| Zimmerman: | It would probably be a little bit more efficient if you try to answer the question directly asked of you as opposed to a prolonged explanation, because the Panel has talked about this. We find that sometimes you're kind of getting repetitively heard something and then you try to explain it again and you go back to where you were. Look, it's not easy. I understand that you want to get your story out and be sure that you've heard it, as many times as you can say it, it sinks in. Try to be a little bit more efficient with everybody's time. |
| Alvarez: | Absolutely. |
| Zimmerman: | Plus, you have another witness coming on. You know, she's being very polite and not cutting you off, but let's try to -- |
| Alvarez: | Yes, sir. |
| Zimmerman: | -- stick to the answer. |
| Alvarez: | Yes, sir. |

Dkt. 51-14 at 131–32.

Salzgitter correctly points out that Arbitrator Zimmerman's request came after more than an hour of lengthy, largely nonresponsive answers by Alvarez on cross-examination. *See id.* at 75–131. For example, when Salzgitter's counsel asked Alvarez if he recalled certain text messages, Alvarez spent roughly three minutes

explaining Esmark's business process and counterclaim. *See id.* at 117–19. Or when Salzgitter's counsel asked whether Alvarez agreed with her characterization of a specific term in the Payment Plan, Alvarez answered in the affirmative before cutting her off and providing another two-minute explanation regarding the difficulty Esmark experienced in taking orders directly in December 2018. *See id.* at 125–27.

A party cannot establish actual bias simply by showing that an arbitrator participated in the hearing or urged a witness to be more concise with his answers. Indeed, arbitrators must be accorded discretion to officiate their proceedings, and federal courts have concluded that evident partiality may not be shown by perceived procedural errors or legitimate efforts to move the case along. *See Forsythe Int'l*, 915 F.2d at 1022 ("[B]ecause the advantages of arbitration are speed and informality, an arbitrator should be expected to act affirmatively to simplify and expedite the proceedings before him." (quotation omitted)).

Further, "[a]bsent some sort of overt misconduct, a disappointed party's perception of rudeness on the part of an arbitrator is not the sort of 'evident partiality' contemplated by the [FAA] as grounds for vacating an award." *Fairchild & Co. v. Richmond, Fredericksburg, & Potomac R.R. Co.*, 516 F. Supp. 1305, 1313 (D.C. Cir. 1981). In fact, courts have found that aggressive cross-examination and even abrasive comments—conduct that far exceeds the behavior Arbitrator Zimmerman is accused of in this case—failed to demonstrate actual bias.

For example, in *Fort Hill Builders, Inc. v. National Grange Mutual Insurance Co.*, the First Circuit found that an arbitrator's "alleged interruptions and interjections of comments or explanations favorable to plaintiff or hostile to defendants to the point where that defendants' lawyer felt he was facing [] an adversary" were insufficient to show evident partiality. 866 F.2d 11, 13 (1st Cir. 1989) (cleaned up).

Judge Lee Rosenthal approvingly cited to *Ft. Hill Builders* when she found allegations that an arbitrator interrupted witnesses, influenced other panel

members, and advocated for a particular party's position were insufficient to demonstrate actual bias. *See Lummus Glob. Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F. Supp. 2d 594, 628–29 (S.D. Tex. 2002), *decision modified on other grounds on denial of reconsideration* (June 14, 2002).

Judge Alfred Bennett, in turn, approvingly cited *Lummus* in a case where he found that allegations of "aggressive questioning" by a panel member, which the movant characterized as an "interrogation" "aimed at embarrassing" the witness, failed to demonstrate the evident partiality necessary to establish actual bias. *See Vantage Deepwater Co. v. Petrobras Am. Inc*, No. 4:18-cv-02246, 2019 WL 2161037, at *5 n.3, *6 (S.D. Tex. May 17, 2019), *aff'd*, 966 F.3d 361 (5th Cir. 2020).

All said, Respondents' allegations regarding Arbitrator Zimmerman's comments, interruptions, or manifestations of opinion are not the type of direct and definite evidence capable of demonstrating partiality that is necessary to show actual bias.[10] Rather, they are quintessential examples of the remote and speculative partiality the Fifth Circuit has held insufficient to establish actual bias. *See Householder Grp.*, 354 F. App'x at 852.

### 5. *Arbitrator Shipley's Comments on the Record*

Lastly, Respondents complain that "Arbitrator Shipley took it upon himself to repeatedly pressure [Alvarez] to admit liability on behalf of Esmark." Dkt. 82 at 9. Before mentioning the complained-of exchange, I should note that Respondents aver that the "seminal issue" at the final hearing "was the degree of Esmark's indebtedness to Salzgitter." *Id*. at 9 n.2.

| | |
|---|---|
| Shipley: | Who -- what are you talking about, who . . . pulled the plug on the 12-million-dollar line of credit? |
| Alvarez: | Salzgitter. Salzgitter told us -- |
| Shipley: | But you still had -- I thought you still had $12 million – |

---

[10] On August 10, 2022, I held oral argument on the pending motions to vacate, modify, and confirm, at which Respondents' counsel agreed that Arbitrator Zimmerman's conduct is attenuated to the issue of actual bias.

| | |
|---|---|
| Alvarez: | No, Salzgitter told us they were cutting us off as of the 1st of January, that we could not buy steel through them and use their line of credit to buy steel. |
| Shipley: | But you still owed them nearly $12 million, I thought? |
| Alvarez: | I'm sorry? |
| Shipley: | I thought you still owed them close to $12 million. I thought that was the whole point, that they're at the max of the line of credit that they had, which was 11 or 12. |

. . . .

| | |
|---|---|
| Shipley: | All right. I'm just trying to understand. You owed $12 million on the credit line to Salzgitter, right? |
| Alvarez: | Go ahead. |
| Shipley: | Right, you owed that sometime in -- |
| Alvarez: | Well, that's something y'all have to decide. But, yes, there was an accounts receivable for $12 million. |

. . . .

| | |
|---|---|
| Shipley: | That was a credit line that Esmark owed to Salzgitter, right? |
| Alvarez: | It was not a credit line. It was a payable. |
| Shipley: | Okay. I'm trying to understand what you mean when you say they pulled the line of -- you said -- no, it' a very specific question. |
| Alvarez: | Yeah, let me explain. |
| Shipley: | I have a very specific question. You said, they pulled the plug on a 12-million-dollar line of credit. |
| Alvarez: | Correct. |
| Shipley: | I'm just trying to . . . |

Dkt. 35-8 at 22–24. Neither party provides the remainder of the transcript, which, of course, would be helpful to fully appreciate the context of the exchange.

To hear Respondents tell it, "Arbitrator Shipley was prepared to ask the same question several times to get favorable testimony for Salzgitter on the ultimate issue in the case." Dkt. 82 at 10. Salzgitter, meanwhile, argues that

Arbitrator Shipley's attempts to understand Alvarez's testimony cannot be characterized as pressuring Alvarez to admit liability on behalf of Esmark.

Put bluntly, this single, cursory exchange does not come close to satisfying Respondents' onerous burden. It cannot be said that a reasonable person would have to conclude that Arbitrator Shipley was partial to Salzgitter based on his questioning of Alvarez. Even when viewed in the aggregate—that is, combining all the Panel's complained-of conduct—Respondents have still fallen well short of producing specific facts that demonstrate that the alleged partiality is anything more than remote, uncertain, and speculative. *See Householder Grp.*, 354 F. App'x at 852.

Rather, for the same reasons explained in the preceding subsection discussing Arbitrator Zimmerman's conduct, I find that Respondents have not demonstrated that Arbitrator Shipley acted with actual bias.

***

In its briefing, Salzgitter argues that Respondents "cite[] no case in which a court found a reasonable impression of bias sufficient to vacate an award based on a family member's employment at a party's law firm." Dkt. 50 at 27. I agree with Salzgitter's survey of the legal landscape, as I have had no luck locating an analogous case myself. However, I posit that this lack of precedent is, in large part, because arbitrators in similar situations have disqualified themselves rather than risk a charge of partiality. But while I may personally believe Arbitrator Shipley should have recused himself to remove even the appearance of impartiality,[11] he by

---

[11] Indeed, in *Commonwealth Coatings*, Justice Black, who delivered the plurality opinion for the Court, made clear that arbitration should strive not only to be practically legitimate but also to avoid any appearance of illegitimacy. *See* 393 U.S. at 150 ("This rule of arbitration and this canon of judicial ethics rest on the premise that any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias. We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another."). Although appellate courts and district courts alike have trended toward Justice White's more moderate concurrence—which attempts to distance itself from likening the ethical

30

no means was required to do so—the Fifth Circuit has made that abundantly clear.[12] *See Positive Software*, 476 F.3d at 286.

Under binding Fifth Circuit precedent, Respondents' evidence and speculative assertions based thereon do not satisfy the arduous standard for vacating an arbitral award. Accordingly, I find that Respondents have not carried their burden of demonstrating that vacatur is warranted under 9 U.S.C. § 10(a)(2).

## C.   ENFORCEABILITY OF THE ARBITRAL AWARD AGAINST MIDWEST

Having determined that the arbitral award should be enforced, I now turn to Midwest's argument that the award cannot be enforced against it because the arbitration "panel failed to identify Midwest as an entity that was liable to Salzgitter." Dkt. 32 at 6. This argument does not move me.

---

obligations of arbitrators to those of Article III judges—it must be remembered that Justice White's reasoning was built on the idea of conflict disclosure "*at the outset*, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity." *Id.* at 151 (White, J., concurring) (emphasis added). Here, the possibility of Arbitrator Shipley's potential bias was foisted upon Respondents mid-race, as Arbitrator Shipley had no way of knowing such a conflict would arise until he learned of his daughter's upcoming employment. As one district court aptly noted, "a party that seeks to disqualify an arbitrator after commencement of the hearings faces an uphill battle." *Thomas Kinkade Co. v. Lighthouse Galleries, LLC*, No. 09-10757, 2010 WL 436604, at *7 (E.D. Mich. Jan. 27, 2010), *aff'd sub nom. Thomas Kinkade Co. v. White*, 711 F.3d 719 (6th Cir. 2013). Indeed, the AAA's current rules allow either party to object only once a conflict is disclosed, at which time, should the arbitrator elect not to recuse voluntarily, the AAA "shall determine whether the arbitrator should be disqualified . . . and shall inform the parties of its decision, which decision shall be conclusive." AAA Rule 18(c). This case is a prime example of self-regulation run amuck, as the AAA's threadbare explanation for its decision not to disqualify Arbitrator Shipley leaves one scratching his head. Indeed, when reading the AAA's response to Respondents' objection, I am reminded of the infamous line from the 1978 film *Animal House*: "You [messed] up. You trusted us." *Mosley v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 266 n.5 (Tex. 2019) (Brown, J.) (alteration in original) (quoting NATIONAL LAMPOON'S ANIMAL HOUSE (Universal Pictures 1978)).

[12] To be clear—and in total fairness to Arbitrator Shipley—I find no evidence in the record that he acted partially. Quite the opposite. But there is a reason six justices in *Commonwealth Coatings* voted to vacate the arbitral award even though they found the arbitrator had been fair and impartial.

This arbitration was brought against three entities: (1) Esmark; (2) Esmark Steel Group, LLC ("ESG"); and (3) Sun Steel Company LLC d/b/a Esmark Steel Group Midwest LLC ("Midwest"). During the arbitration proceeding, Salzgitter dismissed its claims against ESG, leaving Esmark and Midwest as the only respondents. Both Esmark and Midwest were represented by able counsel, who argued forcefully on their clients' behalf throughout the arbitration proceeding.

The final arbitration award ordered that "ESMARK, INC. AND ESMARK STEEL GROUP, LLC, SUN STEEL COMPANY LLC d/b/a ESMARK STEEL GROUP MIDWEST LLC" are jointly and severally liable to Salzgitter for the amounts stated in the award. Dkt. 3-1 at 29. Midwest contends that this language identified two entities–neither of which is Midwest–who are responsible for paying the damages awarded Salzgitter: (1) Esmark; and (2) a non-existent entity referred to as "Esmark Steel Group, LLC, Sun Steel Company LLC d/b/a Esmark Steel Group Midwest LLC." Midwest's argument strains credulity. Midwest cannot offer a conceivable explanation for why the arbitrators would intentionally render a judgment against a non-existent entity named "Esmark Steel Group, LLC, Sun Steel Company LLC d/b/a Esmark Steel Group Midwest LLC."

The face of the arbitral award provides undeniable proof that the award was entered against Midwest.

> The Arbitrators conducted a hearing between the Parties, Claimant/Counter-Respondent Salzgitter Mannesmann International (USA) Inc. ("Claimant" or "Salzgitter"), Respondent/Counter-Claimant Sun Steel Company LLC d/b/a Esmark Steel Group Midwest LLC ("Esmark Midwest") (**Esmark Steel Group, LLC ("ESG") was originally named but dismissed**), and Respondent Esmark, Inc. ("Esmark, Inc.") . . . .
>
> . . . .
>
> Salzgitter presented evidence at the hearing that the amount due by Esmark Midwest under the Resale Contracts is $12,689,133.60. This amount was basically uncontested by Respondents as to the proper amount of the account receivable if the Panel determined that Respondent should not prevail in this arbitration. The Panel finds this evidence of the amount in dispute to

be credible and uncontroverted. In addition, the Panel finds
Guarantee Agreement signed by Esmark, Inc. to be valid and
enforceable. Therefore, **Esmark Midwest, and Esmark, Inc.** are
jointly and severally liable for the amount owed under the Resale
Contracts.

Dkt. 3-1 at 3, 11 (emphasis added). *See also id.* at 30 (Respondents' party-
appointed-arbitrator expressly dissenting as to the judgment against Midwest).

I acknowledge that the arbitrators could have been more precise with their
word choice in the portion of the arbitral award cited by Midwest. At the same time,
the law does not require me to bury my head in the sand and refuse to recognize
what is apparent to everyone else. The arbitrators' reference to "ESMARK, INC.
AND ESMARK STEEL GROUP, LLC, SUN STEEL COMPANY LLC d/b/a
ESMARK STEEL GROUP MIDWEST LLC" is clearly intended to describe three
separate entities–the same three entities that were originally named as
respondents in the arbitration proceeding.[13]

The Fifth Circuit has expressly held that a technical defect in an arbitration
award, such as misnaming a party, does not prevent confirmation of the award. *See
Cigna Ins. Co. v. Huddleston*, No. 92-1252, 1993 WL 58742, at *12 (5th Cir. 1993).
In Cigna, the respondent complained that the district court erred in confirming an
arbitration award because the arbitration was brought against CIGNA Property
and Casualty Company, but the confirmation proceedings were brought by CIGNA
Insurance Company. The Fifth Circuit held that while "the arbitration award
technically identifie[d] the wrong party, this technical defect d[id] not render the
district court's confirmation of the arbitration award erroneous." *Id.* The Fifth
Circuit concluded that where "everyone involved in the action knew of and could
identify the entity being sued, . . . misnomer on the arbitration award injured no
one." *Id.* (cleaned up). The same analysis applies to the present situation. Everyone
involved in the arbitration can identify the entities against whom judgment was

---

[13] Salzgitter acknowledges that the arbitration award should not have been entered
against ESG since that party had been dismissed from the arbitration proceeding. For that
reason, Salzgitter is not seeking to enforce the arbitration award against ESG.

entered—Esmark and Midwest. These are the same entities that fought tooth and nail throughout the arbitration proceeding. Midwest's argument that the arbitrators intended to issue judgment against a non-existent entity elevates form over substance when, at most, we have a misnomer that injured no one.

### CONCLUSION

For the reasons stated above, Salzgitter's Motion to Confirm (Dkt. 22) is **GRANTED**; Salzgitter's Motion to Modify (Dkt. 52) is **DENIED** as moot; and Respondents' Motion to Vacate (Dkt. 33) is **DENIED**. I will issue a separate final judgment.

Signed on this 11th day of September 2023.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE